## DANFORTH v. UNITED STATES.
### No. 11255.

Circuit Court of Appeals, Eighth Circuit.
July 11, 1939.

For former opinion, see 102 F.2d 5.

J. L. London, of St. Louis, Mo. (Leahy, Walther, Hecker & Ely, of St. Louis, Mo., on the brief), for appellant.

Thomas E. Harris, Atty., Department of Justice, of Washington, D. C. (Charles E. Collett, Acting Asst. Atty. Gen., C. W. Leaphart, Sp. Asst. to Atty. Gen., and C. R. Denny, Jr., and Jacob N. Wasserman, Attys., Department of Justice, both of Washington, D. C., on the brief), for the United States.

Before SANBORN and THOMAS, Circuit Judges, and SULLIVAN, District Judge.

THOMAS, Circuit Judge.

On petition of the Government we granted a rehearing limited to the single

question of whether a taking of the appellant's property has resulted from the operations of the Government in carrying out the provisions of the Mississippi River Flood Control Act of May 15, 1928, 33 U. S.C.A. § 702a et seq., and if so the date upon which the taking occurred.

The argument, as originally presented, centered around the appellant's contention that in the proceedings brought by the Government to condemn a flowage easement over his land the lower court was in error in refusing to assess the damages in accordance with the amount fixed by a contract previously, executed between the Government and the appellant. We held that the appellant's contention could not be sustained. Danforth v. United States, 8 Cir., 102 F.2d 5. That issue is not now involved.

As a subordinate issue, however, the appellant urged that he was entitled to interest. from the date of the taking to the date of judgment as a part of his award. He contended that a taking had occurred on October 21, 1929, the date upon which the Government began the construction of the set-back levee; or, if not on that date, then on October 31, 1932, the date upon which the set-back levee was substantially completed. The Government contended that the question of interest on the award was not raised and did not argue it. We concluded that, while the point was not as carefully preserved as might have been done, it was properly before us and that interest should have been allowed from October 21, 1929, the date of taking as fixed by the beginning of work on the set-back levee.

In support of its petition for a rehearing the Government insisted that a taking of the property had not, at any time, become an established fact and that the appellant was therefore not entitled to an award of interest. In order to determine the issue it will be necessary to sketch briefly the outlines of the flood control project at this point on the Mississippi and its progress at the time of the trial in the lower court.

The appellant's property lies in the alluvial valley extending along the Mississippi River from Cape Girardeau, Missouri, to the Gulf of Mexico. The tract includes more than 1000 acres and is situated in Mississippi County, Missouri, a few miles inland from the west bank of the river. It lies about half way between Birdspoint and New Madrid, Missouri. Except for a few acres the land will not be affected by the backwater of the river in times of high water. With this exception the entire property is suitable for cultivation. At intervals in the past however, like other lands in the valley, this tract has been subjected to the overflow of the headwaters of the river in periods of flood. To secure protection from these periodical floods various local interests have been engaged for a number of years in constructing levees along the banks of the river. Certain of these levees have been constructed under the supervision of the Mississippi River Commission created by the Act of Congress of 1879, and the United States has contributed a share of the necessary expense as an aid in achieving a continuous levee system where needed. See Jackson v. United States, 230 U. S. 1, 33 S.Ct. 1011, 57 L.Ed. 1363. At the point of the river under consideration the riverside levee starts at the hills near Commerce, Missouri, and follows the west bank of the river down to a point near New Madrid, Missouri. Between these points the levee varies in height from 10 to 20 feet with an average height of approximately 15 feet. It has been maintained at that height for a number of years and will, if adequately sustained in floodtime, prevent the overflow of the headwaters of the river so long as they do not rise above 58 feet as measured on the gauge at Cairo, Illinois. According to previous records this levee would provide adequate protection to land of the elevation of that of appellant's tract except when such floods as those of the years 1912, 1913, 1927 and 1937 occurred. The floods of 1912, 1913 and 1927 exceeded 57½ feet and it is probable that they could have been prevented from passing over the levee only by the exercise of great care and labor. The flood of 1937 exceeded the highest stage reached in recorded history over a period of some 80 years and could not have been prevented from overtopping the levee even by extraordinary methods of maintenance.

On May 15, 1928, Congress adopted the Mississippi River Flood Control Act, supra, based on a report commonly known as the Jadwin Plan. We have recently had occasion to refer to the pertinent parts of that Act in Sponenbarger v. United States, 8 Cir., 101 F.2d 506, and it is unnecessary to review them here. It will be sufficient to state that in general the flood control

Act contemplates the construction of lateral floodways adjacent to certain sections of the Mississippi River through which the excess waters may be diverted in flood periods in order to relieve the main channel of water that it cannot carry. The theory of the plan is that a large portion of the lands now subject to overflow will receive complete protection if the flow of the surplus flood water is confined within the limits of floodways built at certain strategic points along the river.

The Birdspoint-New Madrid Floodway is one of the projects included in the plan. Beginning on the north at Birdspoint, Missouri, the outer or western limit of the floodway is defined by a set-back levee. This levee includes many thousands of acres of land between it and the riverside levee. It was substantially completed on October 31, 1932. It is, however, only one essential element in the plan. The riverside levee remains at its original height and offers the same protection against overflow that it has since it was originally constructed. To complete the plan upper and lower fuse plug sections are to be created in the riverside levee. The upper fuse plug will be made by reducing the height of the riverside levee about 3 feet for a distance of eleven miles below Birdspoint, Missouri, in order to permit the excess flood waters to flow into the floodway whenever the river reaches a stage of 55 feet on the Cairo gauge. By a similar reduction in the height of the levee for a distance of about five miles above New Madrid, Missouri, the water will return to the main channel. A drainage system is to be constructed at this point to empty the floodway when the flood subsides. Since the lands within the floodway now enjoy protection against floods of an average height of 58 feet on the Cario gauge they will be subjected to the hazard of more frequent overflow upon the reduction of the fuse plug sections.

The appellant's land lies in the floodway; the completed set-back levee proceeds along the western border of his land a strip of which was condemned by the Government for that purpose. He does, however, enjoy the same use of his land that he has always had. As the project now stands, and as it has stood since the completion of the set-back levee in 1932, the only possible result of the operations of the Government to date is that a flood of sufficient height to flow over the riverside levee will be confined within the limits of the floodway thereby increasing the depth of the water covering appellant's land. According to the testimony the probable effect will be an increase in the damage to the buildings and other structures on the property. The 1937 flood did go over the riverside levee but the record does not indicate whether any increased damage actually resulted.

Section 4 of the Act, 33 U.S.C.A. § 702d, directs that "the United States shall provide flowage rights for *additional* destructive flood waters that will pass *by reason of diversions from the main channel* of the Mississippi River: * * * The Secretary of War may cause proceedings to be instituted for the acquirement by condemnation of any lands, easements, or rights of way which, in the opinion of the Secretary of War and the Chief of Engineers, are needed in carrying out this project." (Italics supplied.)

It does not follow, however, that the increased depth of water to which the appellant's lands will be subject upon the completion of the set-back levee is the "additional destructive floodwaters" referred to in the Act. We do not so construe it.

The act was obviously intended to provide for flowage easements in those cases where the operations of the Government will actually result in the hazard of a more frequent diversion of flood water from the river over the lands involved in the project. The appellant's land will be subject to this hazard upon the completion of the fuse plugs contemplated by the plan. A flowage easement over his land was accordingly sought and his damages assessed. But it is obvious that the set-back levee does not tend to divert any additional water from the main channel of the river; and the Government cannot be held to have taken the appellant's property merely by reason of its construction. It in no way deprived him of any of the rights attributable to his ownership of the property. He enjoys identically the same protection from overflow that he has always had. The mere fact that the effect of the set-back levee may be to increase the depth of the water on a part of his premises in the event of a major flood is an incidental consequence for which the Government can not be held liable. See Bedford v. United States, 192 U.S. 217, 24 S.Ct. 238, 48 L.Ed. 414; Jackson v. United

States, 230 U.S. 1, 33 S.Ct. 1011, 57 L.Ed. 1363; Sanguinetti v. United States, 264 U.S. 146, 44 S.Ct. 264, 68 L.Ed. 608; Gibson v. United States, 166 U.S. 269, 17 S.Ct. 578, 41 L.Ed. 996; Matthews v. United States, 87 Ct.Cl. 662, decided May 31, 1938.

The appellant contends that upon the practical completion of the set-back levee in 1932 the Government was in a position to put the floodway into operation at any time thereafter, and that this right constituted a taking of his property. His theory is that the Government could dynamite the riverside levee at will and achieve the same result as it would had it actually completed the construction of the fuse plugs. We are not referred to any authority for this proposition other than the fact that Government officers actually did dynamite the levee during the flood of 1937 although at the time the charges were exploded the river had already broken natural crevasses in the riverside levee and the only effect appears to have been a hastening of an otherwise inevitable flow of water into the floodway. It is true that in the Sponenbarger case, supra, we referred to the fact that the Jadwin Plan provided that the fuse plug there involved might be "blown" or crevassed if found necessary to hasten diversion. Assuming that the same provision is applicable here it does not follow that the Government may rightfully place the floodway in operation by dynamiting the existing levee prior to its completion of the fuse plug sections. Section 1 of the Act, 33 U.S.C.A. § 702a, provides "That pending completion of any floodway, spillway, or diversion channel, the areas within the same shall be given the same degree of protection as is afforded by levees on the west side of the river contiguous to the levee at the head of said floodway * * *." The appellant does not contend that the acts of the Government officers in dynamiting the levee in 1937 constituted a taking of his property on that date but merely that it indicated the Government's view of its right to place the floodway in operation. The Government contends that acts of these officers were not authorized by their superiors. In any event their acts can not prevail over the plain mandate of the statute, and we are inclined to attach but little importance to them since they were done in the midst of the pressing emergency and at a time when the appellant's land was subject to an inevitable overflow.

In an effort to bring himself within the scope of the Sponenbarger case the appellant argues that the landowners in this floodway have been deprived of their right of "self-defense" that is, their right to raise the existing riverside levee and thereby gain additional protection from such floods as may occur in the future. No authority is cited for the argument. So far as it appears in the record the title to the riverside levee remains in the existing local levee districts, and we find nothing in the Flood Control Act to prevent the raising of the levee at any time prior to the construction of the fuse plug sections. The situation is materially different from that in the Sponenbarger case where we were of the opinion that under the terms of the Act the United States had assumed dominion over the riverside levee. A fuse plug section had already been created in that case by raising the riverside levee above and below and on the opposite bank of the river. The Government having thus taken control and completed the upper fuse plug, the owners of land in the floodway were deprived of their right of "self-defense" against threatened flood. In the instant case it does not appear that the Government has assumed dominion over the riverside levee. It may do so at some future date or it may abandon the entire project.

Upon a reconsideration of the facts and of the law we reach the conclusion that appellant's land will not be taken within the meaning of the Act until the upper fuse plug in the riverside levee shall be opened and the land is exposed to "additional destructive flood waters that will pass by reason of diversion from the main channel of the Mississippi River."

The result is that the judgment appealed from is affirmed.